## WILLIAM W. CONOVER

*v.*

## HENRY BECKETT et al.

In 1864, a father caused foreclosure proceedings to be instituted against him-
self and at his own expense, and the premises at the sale thereunder were
bought by his son.  In 1872, the son's creditors attached his interest therein,
as a non-resident debtor, and the son entered an appearance to the attachment,
whereupon the applying creditors proceeded to obtain judgments on their
claims, and on those judgments issued executions under which the son's
interest in the premises was sold to complainant in 1874.—*Held*, that the
father would not be permitted to enforce a secret trust in the son in his behalf
as to the property, and that his grantee, under a deed (made a month after the
attachment had issued) stands in no better position.

Bill for relief and cross-bill.   On final hearing on pleadings
and proofs.

*Mr. F. P. McDermott* and *Mr. C. Haight*, for Conover.

*Mr. R. Wayne Parker* and *Mr. C. Parker*, for the executors
of R. M. Blatchford, deceased, and for S. Blatchford.

THE CHANCELLOR.

On July 27th, 1852, the executors of Thomas Hoff, deceased,
conveyed to Isaac S. Lloyd, a tract of land in Monmouth county,
containing about one hundred and forty acres.  Lloyd gave them
a mortgage of the same date for $4,000 upon the property so con-
veyed.  This mortgage they assigned April 6th, 1857, to John W.
Herbert.  September 9th, 1852, Lloyd conveyed the property,

with other land, to the Florence and Keyport Company, which conveyed the properties back again to him April 4th, 1857. After they were so reconveyed, and on the 30th of May, 1857, he gave a mortgage on the Hoff property to his son, Thomas Lloyd, for $5,000, which was assigned by the latter on the same day to Henry Beckett. On the same day he gave another mortgage to Thomas Lloyd on the same and other property for $5,000, which was assigned to William J. Quinlan on the 14th of July following. On the 18th of August, 1857, he gave another mortgage upon the Hoff property to Thomas Lloyd for $5,000, which on the same day was assigned to Henry Beckett. On the 16th of April, 1858, he gave another mortgage to Thomas Lloyd on the Hoff property and other premises for $10,000. On June 5th, 1860, Herbert began a suit in this court for the foreclosure of his mortgage, to which Isaac S. Lloyd, and Thomas Lloyd, and Austin Reid, and David S. Craig (as surviving partners), judgment creditors of Isaac S. Lloyd, were the parties defendant. On the 12th of January, 1861, a final decree was entered in the cause, directing the sale of the property to pay Herbert $3,172.38, with interest and costs, and to Reed and Craig $1,015.33, with interest. Under an execution issued on that decree, the property was struck off and sold, by the sheriff of Monmouth county, to Joseph Lloyd, on the 1st of June, 1864, and on the 20th of that month it was conveyed by the sheriff to him by deed of that date. On the 10th of April, 1872, Asher Holmes issued an attachment for $406.11 out of the Monmouth county circuit court, against Joseph Lloyd as a non-resident debtor, under which the sheriff of that county, on the 18th of the same month, attached the Hoff property as the property of the defendant in the attachment. Under the attachment, John E. Vanderveer, John S. Applegate, executor, Obadiah Holmes, and Henry S. Little, and Augustus, Charles C. and Philip B. Marsh, together constituting the firm of A. Marsh & Co., applied as creditors of the defendant. At the term of January, 1873, the auditor appointed in the cause having reported, judgment final by default was entered in favor of the plaintiff and the applying creditors; the auditor having reported in favor of the claims of all of them. Subsequently, at the same

25

*Conover v. Beckett.*

term, the judgment was opened on application of the defendant in the attachment, on his entering his appearance, and the proceedings were set aside, saving (he gave no bond) all liens created by statute. On the 29th of January, 1874, judgment final was entered in favor of Vanderveer for $609.71, and on the next day final judgments were entered for the plaintiff for $100.98, for Applegate, executor, for $223.37, and for A. Marsh & Co. for $103.10. Writs of *fieri facias de bonis et terris* were issued on the several judgments as follows : On the judgment in favor of Applegate, executor, February 20th, 1874 ; on A. Marsh & Co.'s judgment, March 24th, 1874, and on Holmes's and Vanderveer's judgments, March 27th, 1874. The executions commanded the sheriff, for want of goods, to make the money out of the lands, tenements, hereditaments and real estate whereof Joseph Lloyd was seized at a specified time or at any time afterwards. Applegate's specified the 10th of April, 1872 (the date of issuing the attachment) ; A. Marsh & Co.'s January 30th, the date of entering the judgment in that case ; Holmes's and Vanderveer's the 27th of March, 1874, the date of the issuing of those executions. Under each of those executions a levy was made on the Hoff property. Under them the sheriff sold the property to the complainant, William W. Conover, on the 21st of November, 1874, for $1,500, which were paid by him accordingly, and the sheriff conveyed the premises to him by deed dated December 9th, 1874. Out of the $1,500 the sheriff paid all the executions, and there was left a surplus of $369.19, for which Joseph Lloyd, on the 20th of April, 1875, gave an order on the sheriff to Henry S. Little (he was one of the applying creditors), and it was paid to him accordingly. On the 23d of May, 1872, over a month after the service of the attachment, Joseph Lloyd conveyed the property to Richard M. Blatchford, of the city of New York, by deed in fee, but, as alleged, as collateral security for money lent and money to be advanced by him to Isaac S. Lloyd, who was the father of Joseph. On the same day, as security for those loans, Joseph Lloyd gave to Mr. Blatchford a mortgage for $10,-000 on real estate in the city of Elizabeth. On the bond the payment of which this mortgage was given to secure, there was

an endorsement signed by Isaac S. Lloyd, guaranteeing the payment thereof.　Of the $10,000, $8,000 were advanced on that day and the balance September 11th, 1872.　Other loans were made by Mr. Blatchford to Isaac S. Lloyd, for which three other mortgages were given to him by Joseph Lloyd on property in Elizabeth.　One was given on January 9th, 1873, for $5,000; another, June 7th, 1873, for $1,500, and the third, September 10th, 1873, for $3,500.　Mr. Blatchford held also, as collateral security, the conveyance of a lot of land in Florence, in Burlington county in this state.　On none of the mortgages was anything realized, and from the Florence property Mr. Blatchford's executors got only $1,000.　Isaac S. Lloyd appears to have been indebted, on account of the loans, to Mr. Blatchford, in his lifetime, in the sum of $23,450, on which nothing has been paid but the $1,000 received from the Florence property.　For the balance the estate has no security except the conveyance of the Hoff property, its right to which is denied in this suit, part of the object whereof is to obtain a decree of this court declaring the deed from Joseph Lloyd to Mr. Blatchford for it null and void.　On the 5th of May, 1877, Conover, who had then held the title to the property under the sheriff's deed to him for over two years, filed his bill in this cause for a decree to compel Isaac S. Lloyd to cancel the Beckett mortgages, which the bill states were assigned to and are held by him, and to compel Quinlan and Thomas Lloyd to cancel their mortgages or to redeem the property by paying the $3,600 for which Joseph Lloyd bought it at the foreclosure sale, with interest, and declaring the deed to Blatchford null and void, because it was given subsequently to the issuing of the attachment.

Isaac S. Lloyd, by his answer, alleges that the foreclosure proceedings upon the Herbert mortgage were begun by Herbert at his (Lloyd's) request and expense and for his sole benefit, in order that Lloyd might remedy any defect in his title to the property which might have been occasioned by the conveyance to the Florence and Keyport company (of the stock of which he says he held a large amount) and the reconveyance of the property by it to him.　He also states that at the foreclosure sale

the property was bought in and the deed taken by his son
Joseph merely in trust for him; that he paid the purchase-
money and that Joseph held the premises simply as trustee for
him and had no personal interest in them; that from 1865 to
1873 he, Isaac S. Lloyd, was for the greater part of the time
traveling in Europe for the benefit of his health, which was then
and had been failing and in a precarious state, by reason whereof
he was rendered unfit and unable to exercise the proper care over
the property, and he therefore deemed it advisable to give his
son Joseph the care and oversight thereof, which he did by so
making him trustee; that Joseph exercised no control, or if any,
but very little, over the premises, either while acting as trustee
or before or since that time, and that the authority he may have
exercised over them was expressly delegated by him. He also
says that the mortgages given by him on the property prior
to the foreclosure sale, and which the complainant seeks to
cancel, were paid by him, and that until the property was
conveyed to Richard M. Blatchford he himself held them uncan-
celed, and that since this suit was begun he found them and
handed them over to Mr. Blatchford's executors. He also states
that at the time of the issuing of the attachment Joseph Lloyd
was a resident of Elizabeth; that the judgments in the attach-
ment were personal ones; that they were not recovered until
long after the deed to Blatchford was given, and that the levies
on the executions thereunder were merely on Joseph Lloyd's
interest in the property, and subject to prior liens and encum-
brances; that Joseph had no interest in it, and if he had, it was
subject to the conveyance to Mr. Blatchford.

The answer of the executors of Mr. Blatchford and Samuel
Blatchford, his heir-at-law, alleges that the title of Joseph Lloyd
was merely a naked legal one; that the attachment was invalid;
that the judgments therein were merely personal; that if the
attachment created any lien on the property, it was only on the
mere naked legal title of Joseph Lloyd, and that if the judg-
ments created any, it was subject to the conveyance to Mr.
Blatchford.

Those defendants also filed a cross-bill, setting up the same

matters, and charging that the attachment was a fraudulent device to get judgments against Joseph Lloyd, and that Conover knew, when he bought the property, that Joseph Lloyd was a resident of this state, from the beginning to the end of the proceedings in attachment, and that he, Conover, could get no title under the sale if Joseph Lloyd had none when the judgments were entered. They also state that nothing was known by those claiming under the deed to Richard M. Blatchford of the issuing of the attachment, or any proceedings thereunder, until the filing of the original bill. The cross-bill prays that the deed to Conover may be set aside and annulled as invalid if not fraudulent, as against the Blatchford title.

The contest is, it will have been seen, between the claimants under the deeds to Blatchford and Conover, respectively, as to the validity of their respective titles to the Hoff property. That the attachment was issued *bona fide*, there is no room to doubt. Nor is there any reason to question that the proceedings thereunder were all in good faith, and an honest effort of creditors to obtain satisfaction of their debts out of the property of a debtor, who, though he might have been domiciled here, did not, in fact, reside here when the attachment was issued. From the fall of 1871 to May, 1872 (the attachment was issued April 10th, 1872), Joseph Lloyd lived in the city of New York. In his affidavit on which he moved to open the judgment, he says he was, when the writ was issued, temporarily residing in New York with his family. None of his family was in this state. He had no household or establishment here. His house in which he resided, when living here, was in the occupation of a tenant. There was no place here where, nor any person in this state on whom, service of process could be made for him. He was, therefore, liable to be sued by attachment. *Stout* v. *Leonard, 8 Vr. 492; Weber* v. *Weitling, 3 C. E. Gr. 441.* Indeed, he does not appear to have made any attempt to set aside the attachment, nor to have questioned its validity. The only question he raised was as to the validity of the claims made against him. The attachment became a lien on the property from the time when it was issued, and no conveyance of the property by the

Conover v. Beckett.

defendant in attachment made thereafter, was valid as against that lien. The statute provides that it shall not be lawful for any person against whom any attachment shall issue, after issuing the same, to give, grant, bargain, sell, alien or in anywise convey any lands, tenements, hereditaments or real estate lying in any county into which such writ shall have been issued, or any interest therein of which he may be seized, or which he may be possessed of or entitled unto at the time of issuing such writ; and that the writ shall, immediately on the issuing thereof, become and remain a lien on those lands, tenements, hereditaments and real estate, as against the defendant and all persons claiming from or under him by virtue of any such conveyance, until the plaintiff and such of the creditors of the defendant as shall apply under the attachment, shall be satisfied their just debts, or until judgment shall be rendered against the plaintiff and creditors under the attachment, or the attachment be discontinued; and that all conveyances made by the defendant, pending the said attachment, shall be void against the plaintiff in attachment and the creditors who shall become parties thereto. Nor did his entry of his appearance in the suit without giving bond, remove the lien of the attachment. The statute expressly declares that notwithstanding such entry of appearance, the lien of the attachment shall continue. *Rev. p. 48 § 39.*

But it is urged, in behalf of the executors and heir-at-law of Mr. Blatchford, that the proceeding by execution was unauthorized by the statute or by the practice of the courts. The statute provides that in case of appearance, the suit shall proceed in all respects as if commenced by summons. It is laid down that when, in a suit by attachment, the plaintiff obtains a judgment which, by the existing law, is a lien upon the property attached, the lien of the attachment becomes merged in that of the judgment, and the only effect thereafter of the attachment lien upon the property, is to preserve the priority thereby acquired, and that this priority is maintained and enforced under the judgment. *Drake on Attach.* § 224 a. Our statute provides expressly for sale by an auditor only in the case of default. And it is silent as to the course of proceeding after judgment in case of appearance. In

the case in hand, the judgment by default was set aside. The statute provides that the act shall be construed in the most liberal manner for the benefit of creditors. Under that provision, it has been held that the proceedings in attachment do not abate, and the lien created thereby is not lost, by the death of the debtor. *Smith* v. *Warden, 6 Vr. 346.* It seems quite clear that the courts would not hold that the lien was lost, because instead of sale by an auditor to pay the debts established in the suit, the property was sold by execution issued on the judgment of each creditor, who had pursued his claim under the attachment to judgment, but, on the contrary, would give effect to the lien by holding that the sale under the execution conveyed the title as it stood at the issuing of the attachment. It is enough, however, for me to say that the attachment act preserves the lien, and the court has issued an execution on a judgment in the attachment, commanding the sale for want of sufficient goods of the land attached, as of the date of the issuing of the attachment, and that the land has been sold and conveyed under the sale. The Applegate execution directs the sheriff, for want of sufficient goods, to sell the lands, tenements, hereditaments and real estate of which the debtor was seized at the date of the issuing of the attachment, or at any time afterwards, and the property was sold under that execution.

But it is insisted that the debtor had, in fact, nothing but a mere naked legal title to the property when the attachment was issued, and that he was but a trustee for his father, who was the equitable owner of it, and therefore that nothing was in fact attached. The alleged trust was a secret one, and it had existed for eight years when the attachment was issued. In all that time Joseph Lloyd appeared to be the real owner of the property. His father lived in Plainfield when the sale under the foreclosure was made, and he was not out of health. Neither the father nor the son gives any reason, nor does it appear why the property was bought in, in the name of the son. The latter says he knows of no reason why his father did not take the title in his own name. The son was in possession of the property from the time he bought it until he conveyed it to Mr. Blatch-

ford. He let it and received all the rent. He does not appear ever to have said that his father or any one else than himself was the owner of the premises. Indeed it is proved that he claimed to be the owner of the property in January, 1869, and then negotiated a loan upon it. The property was known as his, and there was nothing to prevent others from giving him credit as being the owner of it; but, on the contrary, there was everything to induce them to do so. When it had been attached as his, he did not even then disclaim the ownership. The property was sold to the complainant, Conover, for $1,500, which he paid, and with that money the judgments in attachment were paid off, and Joseph Lloyd gave to Henry S. Little (who was one of the applying creditors, but who had not obtained judgment for his claim) an order on the sheriff for the surplus, $369.19, and it was paid over to Mr. Little accordingly. Mr. Conover had no notice of any claim on the part of Mr. Blatchford when he bought. And while, on the other hand, it is said that Mr. Blatchford had no notice of the attachment when he took his deed, it does not appear that he was not informed of it, and if it did, he was bound by the record, which gave him notice of the issuing of the attachment. Nor is it any answer to say that he could not have supposed that any attachment would be issued against Joseph Lloyd, who was a resident of this state. On the contrary, he is chargeable with notice of what the records would have disclosed to him on examination. It appears, as before stated, by the answer of Isaac S. Lloyd, that the foreclosure by Herbert was begun at his request, and at his expense, to answer his own purpose, which, he says, was to remedy any defect there might be in the title through the conveyance to the Florence and Keyport Company and the reconveyance by it to him. But he does not state that there was any defect, and it does not appear that there was any. He caused the foreclosure of a mortgage given by him on his own property, held by him, and, according to his statement at the sale, bought in the property through and in the name of his son, for, as the latter says (and as the fact appears to be), about the amount due the holder of the mortgage on that encumbrance, although there was a sub-

Conover v. Beckett.

sequent lien of over $1,000 on the property under a judgment recovered against him, the money due on which was, under the decree, to be raised by the sale of the property. It seems quite open to conjecture whether the object of the transaction was not the shifting of the title to protect the property from his creditors. Conover should be regarded as a *bona fide* purchaser for valuable consideration, and his title be protected accordingly from secret trusts or liens. The act " relative to sales of land under a public statute or by virtue of any judicial proceedings " (*Rev. p. 1043 § 7*), provides that the deed of conveyance of the sheriff on a sale under execution for the lands sold, shall transfer to and vest in the purchaser as good and perfect an estate to the premises as the person against whom the execution was issued, was seized of or entitled to at or before the judgment, and as fully, to all intents and purposes, as if that person had sold the property to the purchaser and received the consideration-money, and signed, sealed and delivered a deed therefor. The attachment act provides that every grant, bargain, sale, assignment, transfer, assurance, alienation and conveyance made by the auditor under or by virtue of the act shall be as good and effectual in law as if executed by the defendant at or before the time when the attachment became a lien upon the estate, real or personal, so sold, assigned or conveyed. *Rev. p. 51 § 53.* The sheriff's deed conveyed to Conover as good a title as Joseph Lloyd could have conveyed to him at the time when the attachment was issued. If Joseph Lloyd had sold and conveyed the premises to Conover at that date and received the purchase-money, and the latter had had no notice of any trust, he would have taken the title free from any claim on the part of Isaac S. Lloyd under the alleged trust. A purchase at a judicial sale, perfected by the execution of a deed, discharges prior equities of which the purchaser has no notice. *2 White & T. Lead. Cas. (4th Am. ed.) 94,* and cases there cited. In such a case as this, where a father puts the title to his property, through foreclosure proceedings, apparently adverse but actually begun at his request and at his expense, in his son, to be held under a secret trust for him, and permits the son to deal with the property as his own, for years, and never makes known, in

any way, the existence of a trust in his favor, until the creditors of the son have seized and sold the property for their debts to one who has paid his money for it, with no notice of the trust, it is too late for the *cestui que trust*, or any claiming under him, to set up his claim to the property. Isaac S. Lloyd would not, under the circumstances, be permitted to enforce his secret trust as against Conover, and those claiming under the deed to Richard M. Blatchford have no better standing. The case of *Depeyster* v. *Gould, 2 Gr. Ch. 474,* cited and considerably relied on by the defendant's counsel, differs essentially from this. There the father assigned a mortgage held by him to his son, in trust, to secure a debt from him to a society. The trust was to collect the principal and interest, and out of them satisfy the debt and pay any balance to the assignor. The mortgage was foreclosed. The son being, at the time of the sale, absent in the south, the father, as his agent, and in his behalf and at his request, bought in the property. The deed was made to the father and was recorded. There was no payment of purchase-money. It was credited on the execution. The son took possession of the premises and leased them (in the name of the father) and received the rents and profits, and accounted for them to the treasurer of the society. The father attended the sheriff's sale with the intention, previously expressed, of taking care of the interests of the son, and preventing a sacrifice of the property. On the day before the sale, he went to the office of the treasurer of the society for whose benefit the sale was to be made, and, mentioning the absence of the son, said that some one ought to attend in the son's behalf. No part of the rents or profits ever came to the father's hands. After the sale, an attachment was executed upon the property at the suit of a creditor of the father, and the bill was filed to restrain the plaintiff from proceeding therein. The difference between that case and this is obvious. There will be a decree declaring the invalidity of the conveyance to Mr. Blatchford, and the cross-bill will be dismissed. The bill prays that the holder or holders of the mortgages given upon the property to Thomas Lloyd may be required to deliver them up to be canceled, or to release the premises therefrom, or may be compelled

to redeem by paying the purchase-money paid by Joseph Lloyd for the property at the foreclosure sale, with interest thereon. As owner of those mortgages, Thomas Lloyd was made a party to the foreclosure suit. Isaac S. Lloyd paid them all off. It does not appear when he paid them—whether before or after the sale under the foreclosure—except, as Mr. Parker says, he told him that he paid one of them, he cannot remember which, before the foreclosure. Mr. Parker does not remember when he said it was that the others were paid. Seeing that the foreclosure was brought about by Mr. Lloyd himself, to perfect his title to the property, as he says, it is quite probable that those mortgages were then under his control. They were given to one of his sons, and may have been without consideration, and given for his own benefit merely. If he paid them before the foreclosure sale he would have no right to redeem ; if he paid them off afterwards, he did so voluntarily, paying them off as encumbrances on his own property. The bonds were all made by him. Why he held them uncanceled does not appear. After this suit was begun he handed them over to one of the solicitors of Samuel Blatchford, and the executors of Richard M. Blatchford. What he said to Mr. Parker on the subject of his reason for holding them uncanceled is, of course, not competent evidence. The defendants have not seen fit to adduce any evidence as to the time when those mortgages were paid, except Lloyd's statement. While it appears that one of them was paid before the foreclosure sale, it does not appear which it was, and it does not appear that the others were not also paid before that sale. It will be decreed that the mortgages be delivered up to be canceled. The complainant is entitled to costs of both the original and cross suits.